Great. Thank you very much, Your Honor. Can you all hear me okay? Wonderful. Good afternoon and may it please the Court. I'm Mark Freeman for the government and aspirationally I would like to reserve five minutes for rebuttal. All right. The Court has before it today two petitions for writs of mandamus from the United States. The errors addressed in those petitions are different and they warrant correction independently. But the petitions share a common theme. Discovery in this case has now exceeded all ordinary bounds of government litigation and especially military litigation. And without this Court's intervention, it's only going to get more extreme. The District Court has already permitted- Let me ask you this, Mr. Freeman. I used to be a trial judge and I did discovery disputes back then and then I went to the State Court of Appeal and now the Ninth Circuit. And I don't consider myself a discovery referee. And it appears that, you know, I mean, why aren't you just asking this Court to be a discovery referee for you? Because mandamus, it's extraordinary relief. And if you just keep coming back here every time, you know, I would hate to give anyone the impression that every time they get an adverse ruling on discovery that they have a direct route to the Ninth Circuit. And a couple of other things just in terms of it that seem to be, you know, you might want to respond to this, but it seems to be that the government's proffering documents to the judge below or the referee that she's hired that they haven't even looked at. Or they're, you know, they're not doing, they're just saying, well, here are the boxes and we haven't even read them. And so it's not the court's job. So it just doesn't, I'm just wondering if the government isn't just misusing this court to be a discovery referee because you don't like the one you have. Thank you, Your Honor. There's a lot in your question and I hope I can take those things. I know, and a little attitude too, and I'm just being frank with that. That's fine. Look, we appreciate that mandamus is, as I think, you know, the DC Circuit has said, and more rarely granted. I have never before in my career filed three mandamus petitions in a single case. We appreciate that this is extremely unusual. There have been many, many discovery orders in this case that we think have been unlawful or not supported by the record or improper, but we did not come to this court. We've abided by them and turned over thousands of documents. We are here because there are several discrete, clear errors that do warrant an exercise of this deposition of current and former cabinet secretaries, and the second is the essentially rejection of the entire deliberative process privilege as applied to the government. Now, but on the cabinet secretaries, why isn't that premature? Because my understanding is that depositions haven't even been noticed, and they said they would give 30 days notice. Yes, Your Honor, and let me address that directly. The plaintiffs noticed those depositions for specific dates in May 2020. When the government moved to quash them in the districts in which the notices were filed, the plaintiffs litigated those motions to quash, had the cases transferred to the district court in the Western District of Washington, litigated without any suggestion that they didn't intend to take those depositions, and it was only after the district court here authorized the depositions without limitation and the government said we were going to seek relief in this court that plaintiffs said, well, actually, maybe we don't need those depositions right now or maybe ever. It was the first time at that point, and I think a couple of things about that. First, the fact that the plaintiffs would say that they may not take the depositions at all. They may choose that they may not think it's necessary is, I think, pretty compelling evidence that they don't have the extraordinary circumstances that are required to be shown under Morgan and all the cases interpreting it in order to secure such depositions, and second, the government should not be in the position of waiting for plaintiffs to decide when in their convenience they want to depose cabinet secretaries. They've said they'll wait 30 days, but the district court has already said that this discovery should go forward, so if the court prefers... Is there still a stay motion pending before the district court? We've sought a stay of all discovery. I believe the district court has denied a stay of the depositions, but even if the district court has not yet denied that... I don't think that's correct. I mean, my understanding is that that is still pending and the district court, that's why the district court said it the district court's filing. If the district court has not, and I'm sorry if I'm confusing the two different stay motions that we filed because we've sought different types of relief there, but if the district court has not stayed those depositions and this court wishes to wait to act to either to grant a stay or to act on the mandamus petitions and then until the court acts on that motion, that's of course proper, but the district court did not say that there was any contingency before plaintiffs noticed these depositions. They could have noticed them the day after, and if the court prefers that we wait until those depositions are noticed and come back with an emergency motion in this court, we can do that, but every court of appeals to consider the same question has concluded that a mandamus is appropriate for a deposition sought by a cabinet secretary of the United States. But let's say, Mr. Freeman, there's four people that they wanted to depose, and I would say two are a little bit higher than the other two possibly, but I agree with that candidly. Madison, Wilkie, I think are at the top of the pyramid, and then the other it's Morgan and Curta or something like that. Yes, Selva and Moran. Yes, your honor. Okay, Selva and Moran. Okay, I guess I'm just making up names now. No, those are other names in this case, but not these names. Okay, so let's say they depose one of the lower people, and everything comes out there. It gives them access to many things that they didn't know about before. Then doesn't that make the evaluation of the other ones different? You know, with each deposition they take, you're dealing different because if you already have access to the information, then they may not be able to show extraordinary circumstances or no other way to get a hold of it. Absolutely, your honor, and thank you for that. Let me make a couple points about that. First, yes, the extraordinary circumstances test includes as an element of it that the same information cannot be obtained in less intrusive means. Now, that's the reason why we think all four of these depositions ought to be off the table because, of course, two years ago, I stood in front of Anthony Curta, who chaired the meetings of the panel of experts and attended the other ones he didn't chair. Now, plaintiffs have never taken that deposition. Likewise, we've offered the deposition of Mr. D., Tom D., who is the dissenting member of the panel of experts, filed a written dissent from its conclusions. He's the author of some of the emails that plaintiffs quote in their papers, and we said, okay, if you think he is your key, depose him, and plaintiffs have never done that either. Instead, they've gone to the cabinet secretaries and the senior most military leaders of the United States, and in our view, that's improper. So my understanding of their position, I'm sure we'll be able to ask them, too, but I thought they were saying we noticed these depositions because we may need to take them, but we're now saying we're not doing them yet, and it's partly because of the document disputes. I mean, my understanding at this point was that they don't know what information they can obtain from other means because they're still fighting with you about the documents. So I have not heard plaintiffs say that they don't need the depositions of Secretary Mattis or Secretary Wilkie. The theories that they argued in their response to the petition for mandamus in this court were that Secretary Mattis committed bad faith. That was the finding by the district court. Now, they've walked away from that in their papers, but that was the finding of the district court in response to argument that plaintiffs made in district court, and as to Secretary Wilkie, their argument was they needed to know whether he controlled information flow or things. It wasn't in any way contingent on getting or not getting the documents, but if Mr. Patton wants to tell us today that they don't need those depositions, that will be welcome news to us. Well, isn't that, I mean, you were just criticizing them for saying that they don't know if they want to take them yet, so I don't understand your answer. You were just talking about their not being sure. Right, and look, the baseline rule in every circuit is that you do not get to depose a cabinet secretary unless you have extraordinary circumstances and cannot obtain the information from lesser sources. Now, they've made the argument in district court that they satisfy that standard. They haven't said maybe someday we'll satisfy that standard. They've made the argument that they do satisfy that standard, and the district court found that they do satisfy that standard, even given the other things that we've released. So that's why we are here on mandamus today, because as far as I understand it, the plaintiffs could, right now while we are in this oral argument, the plaintiffs could send a deposition notice to the Secretary of Veterans Affairs of the United States, and that's improper and unjustified. I did want to circle back, if I may, to Judge Callahan's questions before about whether we are just dumping documents without looking at them or over-asserting the deliberative process privilege. I'm glad you asked that, Your Honor. I want to take a little bit of time today to address that, if I can, because in our view that is just false. I mean, on the question whether attorneys have looked at this case, what the district court got upset about was that the DOJ litigation team, the small number of DOJ trial attorneys who have appeared in this case, have not themselves set eyes on every document withheld as privileged. That's ordinary. The DOJ attorneys relied on 20, 30 attorneys at the Department of Defense, some of whom have filed declarations in this case, including Bob Easton, the Director of the Office of Litigation at DOD. It is just like in a private law firm, a boutique litigating firm may retain contract counsel to look at documents and assert privilege. The Department of Justice used lawyers at the Department of Defense to look at these documents, and they were reviewed very carefully. So, no, of course. But there was stuff in there, there was like a $22.50 book or something that you could, that was included in there. It was just, it just didn't seem like it was. I mean, I've done in-camera review, and when you go in there and you find things that are just ridiculous, where there are ridiculous claims, there is a loss of confidence in people better at, and it seems to me that there's a loss of confidence in what you're throwing in there, and that doesn't help your position. I agree with that, Your Honor, and I appreciate that. I'm sure errors were made, and we regret the errors, but I want to make clear that they're nothing like the volume or even the order of magnitude that the District Court says. In the court said that in the 800 sample documents that the court reviewed, that 90% weren't privileged at all. Well, that's because of the District Court's categorical legal ruling that all documents outside of two narrow timeframes were simply ineligible for the privilege because they were not pre-decisional to the Mattis and Carter policies. What the District Court said was, as a result, any document outside of two narrow windows that the District Court itself said could not be subject to privileged claims. But she didn't say they could not be. She said they had to be reviewed in camera. No, that's not correct, Your Honor, and this is important. In her July 15 order, she said they were not privileged. But then August 17th or something, it was revised, so I think, I'm not sure what the point of talking about the earlier version once it was revised is. Well, the point is that the District Court has never actually clearly walked back from that. What the court has said is, if we submit documents in camera, the court will then determine whether those documents are privileged. But first, we have to submit a personal affidavit from DOJ Litigation Council, which obviously has the effect of raising professional responsibility questions and deterring what we think is zealous advocacy for our client. And second, when we submit those documents, even when we did so, the court applied the same standard. That's why the court in the recent 28-J letter that we filed found all the documents in which the Department of Defense deliberated about what steps to take in response to the President's tweets to be categorically ineligible for the privilege. Now, those are not deliberative of the Mattis policy. I know you've been upset about the quotes in that order, but I read them and they don't seem particularly deliberative. So could you explain why you think those quotes show a deliberative process? Sure. I mean, those quotes in the order are, some of them are phrased expressly in terms of recommendations to Secretary Mattis about what positions to take, steps to take after the President's tweets. They're non-final. I mean, are they mostly like, I don't think I'm the right person to comment or I'm not going to comment or I guess I need to pull them up. But this was a surprise. None of that sounds like we're really contemplating what the best policy is. Well, some of them were draft talking points to the Secretary of Defense that were non-final because the comments hadn't been received. Some of them were commentary between the Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff. There's a declaration, a detailed declaration filed by Bob Easton in this case, the head of the DOD Office of Litigation, that explains why we thought each of those were properly deliberative. And your Honor, you and I may disagree on some of them on the margins, but I really don't think it is true that those documents are categorically 100% non-deliberative. Is that a deliberative process statement? That particular statement and the abstract may not be, but we can look at particular documents if the Court wishes. But there were in those documents, there were draft talking points for the Secretary of Defense. There were recommendations, documents entitled. One of the quotes, if I recall, actually says, I recommend that you, I mean, these are quintessential recommendary documents. And my point here is not so much any individual document, but that in the entire history of this case, the District Court has not once found a single document of the Department of Defense to be adequately protect, actually protected by the deliberative process privilege. She said a handful, 20 or so might be privileged, but when the issue has been joined, when the plaintiffs have said our need outweighs your interest in the confidentiality and full and fair, frank and candid deliberation within the Department of Defense, every single time the District Court has said the plaintiffs get the document. And that's in the face of discovery requests that ask for draft final reports to the Secretary of Defense, the Secretary of Defense's personal handwritten notes on draft reports. These are quintessential deliberative documents. And this court specifically instructed the District Court two years ago. Can I ask you about those handwritten notes? Are you talking about the Mattis handwritten notes? Yes, Your Honor. So are you asserting that those are protected by the presidential communication privilege? It seems like everyone is talking about the deliberative process privilege. And am I right that you're not asserting a communication privilege? As to those, as to those documents in this case, where I don't believe we are serving a presidential communications privilege, my trial counsel can correct me if I'm wrong about that. And I may correct this on rebuttal, but my understanding is no. We're talking about deliberations between Secretary of Defense and his closest advisors, his handwritten notes on a draft of the final 44-page report. And if plaintiffs had filed a FOIA request for that, of course, it would be deliberative. And we understand that in constitutional litigation, it's a qualified privilege. But that's quintessential deliberative material. And this court instructed the District Court to take that issue seriously. And in all candor, over in the last year, the entirety of the rationale the District Court has given for why there is no deterrent effect, why the policies of the deliberative process privilege are not implicated, is that there's a protective order in this case. Even though, of course, this court held in the Perry v. Schwarzenegger case that that's not sufficient. And even though it's cold comfort to military officers to hear, don't worry, your honest, candid assessments of sensitive topics will just be given to the United States opponents in litigation. This privilege exists for a reason. And we haven't come up to this court for every erroneous discovery order. But we do think we're entitled to have the government's privileges, executive privileges, taken seriously in this case. And for the same reason, we think we're entitled to have the plaintiffs pursue discovery from far lower officials in the Department of Defense if more discovery is needed at all. Let me ask you this, Mr. Freeman. If I agree with you on the mattice. Yes. Let's say I agree with you on that. But there's a whole lot more on that. If I agree with you only on that, have you met your burden for mandamus overall, just because I agree with you on one small piece? Obviously, I think yes. Well, it still seems like you're asking for us to be discovery referees. No, I'm asking if I may, and this is helpful. I'm asking that the court correct three errors. And there are two petitions in this case. And those petitions ask for three forms of relief. The first is to vacate the orders requiring the disclosure of deliberative documents in the absence of any assessment by the district court of why plaintiffs need them and why, and in a good faith way, why their need for those now, given everything they've received since the hearing in this case in this court, why they still need those documents and why that outweighs our privilege. That's number one. Number two, we think the depositions of senior officials is just classic mandamus and is warranted under the extraordinary circumstances test. And number three, and this is, I'll just concede, this is the most aggressive of our asks, but we think that this case has now gone so far beyond what this court contemplated a year ago, where the court said the Mattis policy has to be assessed on the record on which it was based. And it is turned into a search of the entire Department of Defense for evidence that this is all somehow a sham, even though the, as we know, Secretary Mattis postponed. Well, this is where you're asking for a stop discovery and world peace. Okay, that's, when you say that is the most aggressive, it's very aggressive. And as I said, this is, I've only once had been involved in a case where mandamus relief went that far. That was the in Ray Clinton case in the DC circuit just a couple of months ago. And there, the DC circuit granted mandamus and said, yes, discovery. And that was a FOIA case, but it said, FOIA can't, you can have discovery sometimes, but the discovery in this case has gone so far beyond the bounds that it's time to stop. And we're asking this court for the same relief because we think this court too is in the same position vis-a-vis the district court that the discovery in this case has gone so far beyond what has been sufficient to enable judicial review of equivalent claims in every other one of the controversial cases that this court has seen, DACA, temporary protective status, the travel ban, that these are controversial cases, but they don't have depositions of cabinet secretaries or disclosures of every deliberative document in the Department of Defense. And those are also cases other than the travel ban case in which we didn't have the additional overlay of the standard of review for military decision-making in which the Supreme Court has said the discovery ought to be highly attenuated. We're here because the standard of review here though, under our last decision, right? So did any of those cases you just listed off? It was hard for me to remember all of them, but do any of them have a heightened standard of review like we have here? Well, sure. I mean, in Rotsker, there was a claim that it was there was a claim that it violated the First Amendment on what would have been strict scrutiny in the civilian context. In the travel ban context, the court will recall there was an equal protection claim and an argument that the Supreme Court says it was rational basis review. The Supreme Court said it was rational basis review. That's true. But in saying so, the court also noted that the record from the president gave the rationales and was sufficient for review and noted that cited the exclusion from the FOIA and from discovery of deliberative materials. So the point is, we are where we are. There's a lot of water under the bridge. We're not asking the court to claw back all the deliberative material that we gave the court after the plaintiffs, after the District Court and the District of Columbia's ruling in the Doe case. That's all the deliberative materials from the panel of expert, all of their communications. They have all that. We're not asking to claw that back. But our point is, the District Court has not enough. Why is that not enough to decide the question this court laid out in its decision a year ago, which is whether Secretary Mattis reasonably determined that this policy substantially furthers important government interests? We're prepared to litigate that question. And we understand that the District Court may not agree with us. Members of this panel may not agree with us. But we're not here today about the merits. Well, something happened after, though, since Judge Friedland joined us after the original panel. And then when all of this came up, something that I didn't know the first time is after Mattis left, then there was other stuff, there was other stuff that went on that we didn't really know about the first time. I'm sorry, I may not know what the court is referring to. Secretary Mattis adopted the sham theory. Secretary Mattis began this policy before the president's tweets in June of 2017. Before the president's tweets, before the president's memorandum, Secretary Mattis postponed the accession date under the Carter policy. This is all in the record. And he didn't do that just on a whim one day. He did that at the recommendation of the service secretaries of the Army, the Navy and the Air Force and of the Commandant of the Marines. Those recommendations are also in the record. So this was an organic request from the military. But it seems, though, that it appears the panel's first recommendation was rejected, and the panel's final recommendation was somewhat modified or amended before the recommendations were submitted to Mattis. And what materials have the defendants given the plaintiffs covering the events between, I think you have December 13, 2017 to January 11, 2018, January 1st, 2018 to February 22nd, 2018 and February 22nd, 2018 and March 23rd, 2018. Yeah, thank you. If I may, I know I'm already a little bit over my time. We're asking you questions. So thank you for the opportunity to address that. What they're referring to is a draft summary of the panel of experts final conclusions was presented to DOD leadership in December 2017. It's in the record. And that panel, that draft recommendation, which plaintiffs now have an unredacted form, shows exactly the same recommendations that Secretary Mattis ultimately accepted. No difference. Now, when they say it was rejected, what the evidence indicates is that then Vice Chairman of the Joint Chiefs of Staff Selva and Deputy Secretary of Defense Shanahan, to whom this presentation was given, said, we don't think this is ready for prime time yet. Go back and find more data. That's what they said. That's not the rejection. It's just that you're not done yet. And the panel went back. It met four more times. And then the final recommendation, which is at page 241 of the addendum, is identical in substance to the recommendations originally given to leadership and to what Secretary Mattis adopted at the end of the day. There is no deviation. So I have a question about this, too. So I understand that at one point in the district court, the government's position was that because of what you just said, because the recommendation was the same as what ultimately happened, there was nothing deliberative about the drafts of the report. But then it seems like you've totally changed your position on that. So can you explain that to me? I can. Yes, Your Honor. I just encouraged the court to look at the transcript of that passage in the district court. What happened was a discussion about what the district court was asking, why the drafts of was explaining that, of course, drafts are deliberative, even if the substance of the bottom line isn't changing, just like the court might have a draft opinion given to it by a law clerk. The final decision may reflect the same substance, but the writing is different. And we were explaining that, yes, the writing matters. Of course, counsel did not say, and I don't think any fair reading of that transcript would suggest that the panel's recommendations, that's what they were. This is advice to Secretary Mattis. The panel's recommendations was the final decision of the Department of Defense. And it's just not a fair characterization. And again, we've argued both in writing before that and in writing after that, that drafts of the DOD final report are, of course, deliberative. That's just quintessential deliberative material of a final report that was issued by the Secretary of Defense and sent to the president. And just returning, Judge Callahan, if I may, to your question about what happened in this time period. So you had the recommendation to Selva and Shanahan, and they say, go back, find more evidence. There's four more meetings. Now, plaintiffs have pointed out, and they are correct about this, that there are not minutes of those meetings. And so they describe those meetings as undocumented. There's a big difference, though, between undocumented and no minutes. They don't have documents captioned minutes, but they have 14,000 documents from the Department of Defense from the December to January time period, including data presented to the panel, slides, emails among all the panel members, and so on. And if more were necessary, in March of this year, the district court ordered us to go back to all of the people who presented to the panel, everyone who attended the meeting, every panel member, everyone who provided any input. This is response to the plaintiff's interrogatory number 18, and to check with them to make sure that their recollections are accurate and reflected in the record. And we did that. We went back to every person, and we asked them whether the minutes are accurate and whether the information, even from those last four meetings, is included in the panel to the record to the best of their recollection. And they either verified that it was, or they told us stuff that wasn't included, and it was a few minor things. And we put that all in writing and filed it in district court. And that's at pages 121 to 146 of the special addendum to the plaintiff's deposition mandamus response. So this is all in the record and clear. And while I'm on the topic, another refrain from plaintiffs is that there was one member of the panel who said maybe the meeting minutes weren't accurate. That was Mr. D. And what plaintiffs don't know is that that allegation that the meeting minutes weren't accurate was addressed by the panel the very same day, and that is in the record, and that then in interrogatory number 18, we went back to that panel member and said, are you satisfied that these records are accurate to the best of your recollection? And he said yes, and that is also in the record. That's at page 138 of the supplemental appendix to the deposition petition, paragraph 8. So this is all in the record. They have all of the documents. We've seen it is entirely regular. The recommendation from the panel of experts was adopted finally by the panel of experts, sent to Secretary Mattis, and it is, I believe it is undisputed in this case, that the final panel of the final Department of Defense policy tracks what the panel of experts recommended exactly. So we have a regular government process. Plaintiffs are entitled to argue that the justifications given for that policy fail intermediate scrutiny. We don't begrudge them that opportunity, and we may well not win it. I don't know. But in terms of discovery, the case is done. We know what happened here, and a search for sham evidence, turning the Pentagon upside down to find any allegation of bad faith somewhere is fruitless and impermissible, and there's no way. I think unless any of my panel members have additional questions, I'm going to move to the other side. Do either of you want to ask additional questions? Okay, I'll give you a little time for rebuttal, even though we've gone way over. I'll make that decision after I hear from the other side. Thank you. Okay, Mr. Patton. May it please the court, Steve Patton on behalf of the plaintiffs, and with us today is the plaintiff interviewer, State of Washington. I'm going to start off with just a few of the statements that my learned colleague made that I want to correct. So are you going to use all the time, or were you ceding any time? No, I'm using all the time. Okay, thank you. First of all, in terms of what happened at this December 17, 2017 meeting, where the two people that were charged by Secretary Mattis with final recommendations, that wasn't merely go back and get some more data. Please look at the actual documentation. The only document we have about it, and it's an email that was produced as part of the DOE documents. First time any of this had ever been mentioned by any lawyer in this case that we knew about it. But what happened is that General Selma... Mr. Patton, I just heard Mr. Freeman say that you received all the documents relative to the Mattis plan, including those generated between December 13, 2017 and March 23, 2020. I just heard him say that, I believe. And so if you have all of those, why do you need to depose anyone? Because that's... He said it's something like 14,000... I don't know, did you say 14,000 pages? It's not true, Your Honor. They have withheld 50,000 documents. 40% of the documents that they identified as being responsive to our request. We have virtually nothing for this critical period from when the panel's recommendations were rejected until they reported out the exact same recommendations on January 11. How many pages do you have of documents between December 13, 2017 and March 23, 2020? It just dated during that period? Who knows? Yeah. I don't know. All that 14,000 number is apparently they went to relativity and said, that's how many documents within that date range. I don't purport to show that any of those documents tell us what happened during that period in terms of how the Mattis policy was developed. And they don't. We've been through the documents that have been produced. What they've produced is largely junk. Very little about what was actually happening. What we do have that finally enlightened us about some things like this critical meeting where the panel's recommendations were rejected was from the 1,281 documents that the Doe Court ordered produced. That's the tip of the iceberg. And if it wasn't for that production, we never know. We'd never know that the panel's recommendations were rejected by the two people who were responsible for developing the policy. And again, that's Supplemental Appendix 396. And they didn't just say, go back and get more information. And we quote what they actually said at page 10 of our answer, footnote three. But they said, these recommendations aren't defensible. And they're not standards-based. They're status-based. They're not standards-based. Yet, for some unknown reason, four weeks later, after four meetings, and they're not just meetings where there weren't minutes. There's no documentation whatsoever on those meetings. And in fact, plaintiff's own or defendant's own counsel didn't even mention their existence. They kept talking about nine meetings until we found out about this rejection and that the panel that was then reconvened and met maybe three or four more times and ended up with the same recommendations. Two other misstatements I want to correct. This notion that the reason why the district court's been finding 90% of the documents she's reviewed in camera as being non-privileged is not because she's applying in presumptive time frames. She's doing a document-by-document review. And she's finding that 90% or more of the documents that they have claimed privileged are not even remotely privileged. And we've seen some of those as they trickle out. And they're not remotely privileged. And also, it is not true that this court has never ruled in their favor on learning colleague doesn't know what's happening in the trial court. But the in-camera review so far has been limited to whether the privilege even applies. And on that, she's ruled it depends on the group of documents that about 10% truly are privileged. There has been no in-camera review yet on the Warner balancing test. The only application of that has been as to these three categories of petition for mandamus. And the reason why the court has not yet undertaken in-camera review of privilege documents to see if the privilege is overcome is, and this is a subject of our separate motion to clarify, the government's take the position, oh, you can't do that because the Ninth Circuit's administrative stay bars that. Just like they say it bars all kinds of other things that are completely unrelated to the orders at issue in the government's petition. So how would the plaintiff's deposing of the four high-ranking officials differ from asking for their mental impressions, which is improper under U.S. v. Morgan and the cases that follow it? So I have concerns about that. So it also seems that you assert that you should be able to ask these high-ranking officials about the creation of the Carter policy which isn't the policy that we're reviewing here. Happy to address both. On the Morgan, what they do with Morgan is they conflate two different things. They conflate the exceptional circumstances test for whether you can take the deposition with a separate bar on probing mental processes of decision makers. And on that, the district court found in a ruling they don't even reference, let alone challenge that the good faith or other misconduct exception to that Morgan bar applies here in part because of this court's decision that the policy here on his face is discriminatory as well as other evidence. They don't even reference that ruling or challenge it. So your honor, we don't concede that what we want to ask Mr. Mattis and other witnesses about, in fact, does call for their mental processes, but they do cite a very broad initial formulation of that from Morgan. And to the extent, and that is not consistent with subsequent case law, but even if you take that very broad, expansive view of what are mental processes, there's an exception that applies here that the district court found improperly of what was premature or not. And I'm wondering why shouldn't you just select one of those four and depose them? And if they cover everything, then maybe you can't show extraordinary circumstances to depose the other three. Why do you get to go all four? Well, we believe that we have a legal right under settled law and the facts to take all four. What we said in this again was not correct. It wasn't in response to the threatened petition. We said, oh, we're going to pull the brakes on these. Our position has always been, first of all, all depositions, we're going to take CURTA, we're going to take eBAR, but we want to get the documents first, as Judge Friedland mentioned. And we made it clear long before this petition. So if the documents answer all your questions, which I'm not sure anything will answer all of your questions. Honestly, I've said the other side, they want to end discovery. I'm not sure you would ever end it. So that being said, if those documents answer your questions, then isn't there a different analysis for extraordinary circumstances? I'm not sure there might be, but we also might decide that we don't need to go forward or elect not to, even though we have a clear right with those depositions. You're not saying there's any room for more analysis under that. After you get those depositions, can they review that there are no extraordinary circumstances because you have the information you're asking for? Or are you saying, I've already been granted the right to depose all four of them and whatever those documents show, the only person that's going to decide whether we depose all four is me. No, I'm not saying that. And I'm conceding that there is a possibility that subsequent discovery will provide a basis for a determination by the district court that, you know what, you don't need these depositions after all. And we offered to stipulate to a deposition. Now on the depositions, your honor, and then I want to get to the second petition. Our position is that the law here is well settled and all due respect, council misstated what the standard is. The standard that the district court applied is exactly the standard they proposed, the government proposed below. And it's from the case of Letterman that the official has unique firsthand knowledge or, I'm sorry, unique firsthand knowledge to the litigated claims, or that the necessary information cannot be obtained through other less burdensome or intrusive means. It's an or test. The case law is uniform that where is here, there's a showing that that exceptional circumstances are satisfied. Now the district court here, if you carefully, not even carefully parse through her order, she actually ended up applying both of these. She found, yes, they were directly involved. And that's not seriously disputed. The facts are clear. And I think to your point, Judge Kellyanne, as we get more documents, we will find even more bases to take these depositions. I know, but I guess I didn't agree with the district court that strict scrutiny applied. So, you know, it's not, but the question is that, so it's not that I necessarily agree with the district court on everything on this. So I'm not looking at, you know, we're not, we're not all, we're not here all one in the same, but that being said, I don't want to be a discovery referee either. Right. And you shouldn't be. And that was, has been our point from the very beginning that this court should not be, but back to the standard. So it was an or standard, but the court also looked at, okay, can e-bear can occur to provide this information. And if in fact they couldn't, and the court made findings of that, and even where there may be an overlap, for example, the defendants argued, have argued, continue to argue, Hey, other people can say what happened at the panel meetings. Yeah, they can. What about all the things that happen outside the panel meeting? That's what the court said. We have a need for, and even if another witness was at the same meeting, the unique knowledge of these witnesses and their personal recollection as to what happened at that meeting makes their depositions appropriate under set of law. So our position is there's whole body of case law out there. Now the reply brief that they just filed. I want to say I'm really not so sure because if you accept your proposition, we'd be seeing lots of cabinet secretaries deposed and we don't. The fact that the cabinet secretary might have unique information doesn't open the door. I think there's a pretty compelling case to be made that you've got to demonstrate more than just the man might know something. You've got to demonstrate that you can't get from someplace else. And so your effort to slide by that second part is disturbing to me. Well, the court found that each of these witnesses has unique personal knowledge and she made findings that it couldn't be obtained elsewhere. But I would take issue, your Honor, with what the cases show. First, they show that in many or most of these cases where depositions or where parties seek depositions of senior officials, they're not personally involved. In our briefs below, docket 586 and 18 note 8, we cite a dozen or more of these cases. And then below, the defendant cited a bunch of cases where depositions were denied. And if you study the cases, the clear dividing line was personal knowledge. In fact, the two say that personal knowledge is enough. You still have the need element, which it seems to me, you're trying to disregard. Now, I understand what the district court rule, but the notion that it's or that personal knowledge by itself is enough. I don't think that's going to withstand scrutiny. And I really don't think it would withstand the Supreme Court if it gets to that point. So, well, the court then did the right thing because the district court did not rely on that she found both here in our showing was as as to both your Honor. But my point is that if you look at the cases, it is usually the case that these are not witnesses that had direct involvement and therefore their depositions not appropriate, but where they did. And some even suggest that where somebody is personally involved, they always have unique knowledge, right? Because they have a personal recollection and an understanding that can't be replaced by another witness. The president has direct knowledge on this. Can you depose him? Raises separate issues. And we've taken this court's last decision to heart. And we are a challenging executive privilege, but we're trying to get the documents from the Department of Defense first. So and also on the facts again, you've got the law, which is is clear here, but the facts as that show these emails and so forth that show each of these witnesses was involved and does have unique personal knowledge as to each of the events. We seek to depose them on is large. We don't agree with you that it's an org. So we if we think you have to show that they have personal knowledge and it can't be obtained some other way, what they know wasn't also known by someone else who can testify to it, or it's not already in a document. Does anything change? I mean, you came in here now pressing this or argument, but if you lose on that, does anything? It doesn't. No, it doesn't change a thing. In fact, it wasn't even part of my planned remarks. But when counsel I thought had misstated what the standard was, I mentioned that. But it doesn't change the outcome here. It doesn't change the district court's decision. We still win. And there certainly is no clear error for mandamus judge. Could I bring you back to something Judge Callahan asked about, but I think you didn't get to which was how it's about RFP 15 in my mind. So how the documents from before the Carter policy are important, because it seems like one way you could look at this case is you assume the Carter policy was a reason that justified policy. And then the question is, why did it change? I'm not quite sure why you need the documents from before the Carter policy, if that framework could be adopted. Yes, because the government's made it quite clear that they're going to challenge and try to undercut the Carter policy and show that it was not well reasoned or well supported. And they've done that with a couple of our hybrid experts who actually participated in that process. That's where they selected really use some of the Rand Corporation and some of the Carter documents when they think they helped them. So they're going to attack that policy. Plus, from a heightened scrutiny standpoint, we want to identify was there evidence in support of open service that the military knew about, but there was not with the panel, for example. So understanding what the analysis, the information was that led to the Carter policy is important from a heightened scrutiny. But it's not a question of whether one's a better policy or the other. You're attacking the policy. And so if you call witnesses from the other one, it just seems to me that you can cross examine them. You can impeach them. You can support them. You can do all of that and say, you know, I mean, they stand on their own because you're attacking the existing policy. And if the existing policy is not well reasoned, then it falls. Only one of these witnesses do we was on both Admiral Moran. So how is it that two groups of people reached the diametrically opposed conclusion just 18 months apart? What did one group have that the other and that we believe will inform? It's not only defensive, but it also, we believe, will inform us and may have a big bearing on application of the heightened scrutiny. And it is not, Judge Callahan, to say one is right or one is wrong. It's for heightened scrutiny. I want to any other questions in terms of the depositions? Well, are you are you the plaintiffs were taught? Are you willing to commit providing the defense at least 30 days notice of any proposed deposition of a high ranking official? Absolutely. We told them that probably more. And I would suspect that there might be more practice motions practice when we do that in the district court in the answer to your earlier question. And we're not going to do any of that until this document process runs its course. And by the way, this isn't a fishing expedition, as the government repeatedly claims. These are documents that they determined were responsive. It's just that they and if we don't think that, you know, that if you don't start lower, then if you start with Mattis, it's going to be a little bit harder to decide if you could have gotten it somewhere else. No, we will start lower. And we've again, we've made that clear to the other side, not to Mr. Freeman. But we've had discussions about which witnesses we intend to depose and talked about dates before the pandemic shut us down on that. And it became clear through these in camera reviews that there was massive over application privilege going on. Your honors, if I could, I'd like to briefly address the other. You can have some more time. You can. Thank you very much, your honor. So in its prior decision, this court was very clear. It said on remand that the district court should, quote, evaluate the relevance of the requested information and balance it against the military's confidentiality interest. And that in doing so, it, quote, should consider classes of documents separately when appropriate. The record shows that's exactly what the district court did. It divided the plaintiff's requests. First, it had them prioritized, divided them into categories with the input of the parties. And then category by category, it looked at what the relevance was, not nearly in a rule 26 of standpoint, but from the standpoint of importance to the claims and defenses in importance to heightened scrutiny. And it balanced that against the government's confidentiality interest as to those documents. I want to briefly go through the record to just show that's the case and give some citations. So first, as to the working group documents, there was no dispute that the panel was supported by various working groups and a number of individuals who determined what information and recommendations the panel did and did not receive. Defendants did not dispute the relevance of those documents, addendum 104 to 109. Instead, they argued that discovery should be limited to the information that was passed along to the panel, and just limited to that. That's addendum 14 to 15. The court heard argument on that, and she rejected that. The problem that I see is just as important what you don't produce to the panel as what you do produce. It's my position that people who are sorting data, you can leave out studies that you don't think support your positions. And that's what plaintiffs are looking for. Defendants simply ignore that ruling. And as to potential chilling effects, the court noted, and defendants agreed, that the persons who prepared these documents were not decision-makers, but in the words of defendants, counsel were, quote, researchers, quote, who wouldn't be involved in the actual deliberations. That's at addendum 108 and 109. This court, caused the court to question, well, why does the privilege apply at all? But she quickly moved on and said, well, in any event, if they weren't decision-makers, how can there be a chilling effect? That's at addendum 108 to 109. Counsel, defendants, had no response. And the government also ignores that ruling. Second, as to the documents relating to the creation of the DOD report, there was likewise no disputed relevance. As the court noted, defendants had told her that the report was the only exhibit they were going to introduce at trial to show that the policy passes heightened scrutiny. Special Appendix 22 to 23, accordingly, how the report was prepared, what information was considered, whether it came from the panel or other sources are essential to determine whether the justifications of sites were, quote, in the words of the Supreme Court in U.S. Virginia, genuine, not hypothesized, or invented post hoc in response to litigation as required to pass scrutiny. Moreover, during the argument on this, defendants conceded that these documents were prepared after Mr. Mattis' decision to approve the policy and recommended it to the president, and therefore were neither deliberative nor pre-decisional as to the policy. That's at addendum 111 through 113. What's your theory on Mattis' communications with the with Mattis? Are you entitled for that? We're not, we're not there yet. Those documents are not at issue here, and as I said before, we're not going to cross that bridge and exact the privilege until after we have exhausted, you know, the record and looked at alternative sources. I thought those documents were part of RFP 29. Well, what the judge was looking at here were deliberative process privilege. But I think the government said today, maybe they'll correct it, that they're not asserting presidential communication privilege. So if they're not, then I'm confused about the status of that. I thought that those were part of RFP 29, and we have before us a mandamus petition about RFP 29, and the only thing anyone is talking about is the deliberative process. Well, the judge was looking at the, when she said she ordered all documents produced, it was those documents that had been withheld solely on grounds of deliberative process privilege. So of the 50,000, about 35,000, according to the government, were withheld solely on grounds of deliberative process privilege. And so what you're saying is those Mattis notes are not actually at issue in this mandamus petition? They're not in the category? I don't know what, I don't know what notes we're talking about. The notes that I've heard counsel repeatedly refer to were, and there probably are more than one set of notes, I don't know, but notes on drafts of the DOD report. But to the extent there are notes that were withheld on grounds of executive privilege or presidential communications privilege, those are not the subject of this order. This was talking about those documents withheld solely on grounds of deliberative process. And we made it quite clear on remand to the court, and the court understood we're not going to address the executive privilege until later in the case after we see what we can obtain without crossing that bridge. But if we give you something that clearly would be subject to the executive privilege under the deliberative process, then how can they later exert the So if I understand correctly, in their mandamus petition that you're calling the second one, if we consider second and third the ones at issue with us right now, then they talk about the Mattis notes in that second petition, but your understanding is that they're not really actually at issue in the second petition because they were probably under more than one privilege, and so wouldn't be in the category. Yes, that's right, but I think that counsel may be mistaken or confused about which notes we're talking about because notes that they talk about in their brief are on a draft of the DOD report. Counsel's shaking his head like this, so we'll go back on rebuttal. But I don't know about what the documents they've withheld. What I do know is that the documents that were the subject of this process were documents responsive to two requests, 15 and 29, that were withheld solely in grounds of delivery process privilege. Let me ask you this. Okay, we're going quite a bit over, but that's fine because I went over on the other, but I want to make sure if my colleagues have any questions at this point, and otherwise I'm going to ask you to wrap up, but I think Judge Cleston has a question. I have one question. I confess, I guess I didn't expect to be back here two years later with the discovery dispute, so let me ask you just to project going out into the future. We've got to stay in place, and so no progress has been getting made on the cause you're trying to pursue in the meantime, so how much longer should we expect this litigation to continue before we actually get to a resolution in the district court that presumably will come back to us, no matter how it turns out? Well, your honor, if it weren't for them withholding about, you know, 40 percent. No, no, no, no, no, no. I'll give you the excuses. I'm just curious how long is this process expected to take? I think that the district court is working through these privileged claims now on a granular basis, and she is prioritizing particularly critical time periods and doing an in-camera review on that. If this court were to deny the second petition, and she can resume looking at documents on the balancing on a category by category basis, she's already been through most of those categories, and I think that's going to take a whole wide swath of documents, and she won't have to go through the in-camera review because whether those individual documents were ever privileged won't become relevant because as to that category, there's been a finding that need outweighs confidentiality. So the answer I would give is that if this petition were properly denied, and the government was required to produce the documents, now they say that's the bulk of the documents. I doubt it, but I don't know, judge. All of those documents, and they say this is a long way of not answering the question. I recall the frustration when I was in private practice and clients would ask for budgets and timelines and so forth. I'll give you all that. I'm just trying to figure out how much longer are we going to have this show going on the road, and granted, you don't know, you won't be committed to this, but I'd like some kind of ballpark. Yeah, so the judge has set a trial date for May. We would love to meet that trial date, but it means we have to get the documents, and we need to take the depositions. Hey, we've got a trial date set for May. It might move, but that at least gives me some kind of bound. That's what I'm looking for. Thank you. Yeah, we'd hope to try the case, your honor, and I think we had a November trial date. Okay, if Judge Clifton's had his question answered, and you're not really trying to outlive us, then I would like to wrap up. Judge Freedland is considerably younger than we are. Why don't you take a minute to wrap up? Yes, thank you. In some, defendant's second petition is as unsupported as it is unfair to the district court. I urge you to read the transcripts of the two hearings below. I started going through that. They show defendants have invented a story that is at odds with what actually happened here. I also urge you to consider the context, the forest, if you will, for the trees. We talked about the fact that this district court is managing an extraordinarily burdensome process that defendants created, and it's solely because of their over-designation of privileged documents. This massive invocation is unprecedented. The cases both of us have cited involve two or three or four documents that the government's withheld, and even as to those, they redact them and produce parts of them, not 40,000 documents. This massive invocation is not about protecting government decision-making. It is about withholding relevant evidence, and defendants are employing this where the government's intent and decision-making is directly at issue. It's the central issue and dispute, and that's the circumstance where the circuit that has looked at the most of these deliberative process privilege issues, the D.C. Circuit, has one of their cases notes. Okay, you're right. I'm over. Deny the petition, and thanks very much for your time. Okay, Mr. Freeman, I'll give you three minutes for rebuttal. Thank you, Your Honor. Just a few points. Judge Friedland, if I may start with your question about the notes on Secretary Mattis's notes on the final D.O.D. draft. Yes, our understanding is the same as Mr. Patton's in that what's at issue with RFP 29 is documents withheld solely on the basis of the deliberative process privilege, so there are notes. Secretary Mattis's edits to the D.O.D. report are withheld solely on deliberative process grounds. They are at issue in the petition. So are revisions to that report by the Deputy Secretary, communications between the Secretary and the Deputy Secretary about that report. So those are at issue in this petition. There are also presidential communications privilege assertions in this case, which, as Mr. Patton says, we've not gotten to. That takes me to the second point I'd like to cover on my rebuttal, which is just that I think what we heard from my friend is that discovery in this case is not going to end. If these depositions are taken, Mr. Patton wouldn't give up even trying to depose the President of the United States. We're going to have litigation over executive, core executive privilege, presidential communications. We'll have, they will say to the district court, you know, for all I know, the fix was in as a cabinet meeting. We want the minutes of a cabinet meeting. And I think that there's a problem with that. I mean, granted, you you've got lifetime employment, perhaps anyway. But with this, with the policy still in place during all this time, what exactly is the problem? Your Honor, that other lawyers have to a lot of more work, and that's unfortunate. But policy remains in place. I get the same government salary regardless, Your Honor. I assure you, it is no interest to me. But the the government salaries we get from the intrusion into the White House is it would be extraordinary. I would just note in in no never in the history of this country has the President been or been required to respond to civil discovery in a case. I thought we've taken presidential communications off the table. Okay, I'm sorry. That was your I thought was your question. Mine's a broader question. Yeah, this has taken a lot longer than maybe any of us expected before. But how does that really hurt the government as long as the policy is in place? Oh, it's not. I'm sorry. I misunderstood your question. It's not the time per se, Your Honor. It's it's two things. I mean, I think the intrusion from deposing a sitting cabinet secretary is obvious. But if you just take the documents, I know this sounds a little trite, but the Department of Defense takes extremely seriously the principle that the protects that the deliberative process privilege protects. If you'll just indulge me for a moment. The point of that privilege is to permit junior officers, the people who have different ideas to engage in candid debate and share those thoughts about sensitive topics like service by transgender service members. And we can all have different opinions about that. But what plaintiffs want to do is use those documents against the Secretary of Defense's final decision. Now, they're entitled to show sometimes. But that privilege is very important just as a policy matter through the Department of Defense to protect the integrity of DOD decision making and the willingness of junior officers to speak the truth to senior officers. That's a real deal in the largest military organization in the world. This is a very important point to them. It's why we fight over. Yeah, there are documents, for example, the working group documents that counsel reference. These are documents. What would happen to these junior? Are you saying that? All right, so they're speaking truth to power. So power knows. So it's not going to be that. But then if what what are you saying? If they if otherwise they wouldn't say it because then they'll be exposed as being either homophobic or this, that or what? I don't know what what what is that? I'm just trying to make the the basic insight that the Supreme Court noted in cases like EPA versus Mink and the Klamath River case, which is that the the deliberative process privilege protects space for candid decision making. And of course, in any given case, the decision making is done. So you can always say, well, if you turn over those documents, nobody's deterred because that's all in the past. But the point is, the next time there's one of these processes in a panel of experts and the DOD says, all right, soldiers, sailors, I'd like you to tell me the truth. What do you really think about this? And I'll say, well, look, I don't know. Last time someone did, an email was held up in the Ninth Circuit. I mean, that's not a trivial concern. This is very important and is the reason why the deliberative process privilege exists in the first place. That discovery in this case is unfolded as though this is a suit against a big bank or something where, oh, you got a report. I want all the drafts of the report. Your CEO was involved. I want to depose your CEO. This is a suit against the United States military. And there are privileges that the military is entitled to assert. And we've asserted them here. And there's nothing wrong with our doing so. OK, let me just make sure we've gone over time as we continue to. But if either of my colleagues have additional questions for you on rebuttal, then otherwise I will I will bring this argument to a close. Thank you for your arguments in this matter. And despite the fact that this could go on, I think all three of us commit to go on in lives and be there for you as I proceed. Now, this court then will stand in recess and this matter will be submitted. Thank you both. Thank you. Thank you.
judges: Clifton, Callahan, Friedland